UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CASE NO. 5:10-CV-00165-MMH-GRJ

|  |  |
|---|---|
| HWE HOOD, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| HSBC BANK NEVADA, N.A. | ) ) ) |
| Defendant | ) ) ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO HSBC'S MOTION TO COMPEL ARBITRATION, OR IN THE ALTERNATIVE, TO DISMISS**

## I.   INTRODUCTION

The Uniform Commercial Code, Nev. Rev. Stat. §§ 104.9610 to 9625, governs the repossession and subsequent sale of consumers' motor vehicles. It requires that creditors send specific notices to borrowers whose cars they repossess and guarantees borrowers certain rights upon repossession.

When HSBC repossesses its borrowers' cars it sends them form notices which omit or expressly misstate their statutory rights. The form post-repossession notices that HSBC sent to consumers in the past four years violate the UCC by omitting or misstating the following four statutorily mandated disclosures:

- an accurate description of the consumer's redemption rights;
- the method of intended disposition;
- the time of a public disposition, if HSBC intended one; and
- the consumer's entitlement to an accounting of any unpaid indebtedness.

Nev. Rev. Stat. §§ 104.9613 to 9614. HSBC also sent a form deficiency demand to those same consumers, seeking a deficiency after sale. This follow-up notice violates the UCC as well because it does not explain the method by which the deficiency was calculated. § 104.9616. These are not merely "allegations." HSBC's wholesale flouting of the UCC disclosure requirements is apparent on the face of the operative documents, its form notices. In short, the statute requires X, but HSBC did Y.

In an attempt to now avoid accountability for its violations of the law, HSBC seeks to dismiss this case by claiming that the National Bank Act and OCC regulations preempt UCC disclosure requirements. But neither the National Bank Act, nor any federal law governs or even mentions auto repossession. And the OCC itself has determined that the UCC is not preempted by its regulations. In effect, HSBC is claiming that it can repossess and dispose of financed vehicles, and seek deficiency judgments, without *any* regulation of its repossession procedures, and without giving consumers *any* notice of their rights.  This notion is unsupported by case law.

In the alternative, HSBC seeks to send this case to arbitration, but only on an individual basis for each of the 16,000 consumers whose rights HSBC has demonstrably violated in exactly the same way. HSBC's "Cardholder Benefits" brochure, purportedly incorporated by reference into consumers' contracts contains an arbitration clause that would strip consumer borrowers of the right to pursue their claims before a jury, or in a bench trial, and requires that all proceedings remain confidential. The clause also contains a class action waiver which purports to prevent aggregation of claims, even in arbitration.

HSBC trumpets the sanctity of contract to justify its request, as if the unwitting consumers to whom it made vehicle loans at credit card rates of more that 17% per annum had the ability to negotiate the terms contained in the 11 page "Benefits" brochure, and somehow knowingly elected to forego a class proceeding in court in favor of a secret, individual tribunal.

HSBC's contract specifies that Nevada law applies to disputes between it and borrowers. Nevada law holds that a contract is unenforceable when it is both procedurally and substantively unconscionable. HSBC's arbitration provision is both. It is procedurally unconscionable because it is a contract of adhesion, and the clause and its effects are not readily ascertainable from the brochure they are contained in. It is substantively unconscionable because the class action ban effectively serves as an exculpatory clause, relieving HSBC of any liability for its wrongdoing where the potential recovery to individual plaintiffs is small, it is unconscionably one-sided, and its confidentiality provision gives HSBC an unfair advantage. *See D.R. Horton, Inc. v. Green*, 120 Nev. 549, 554 (2004).

For these reasons, more fully explained below, HSBC's motion should be denied as to both its preemption and arbitration components.

II.    **HSBC's Arbitration Clause Is Unconscionable, And Therefore Unenforceable Under Nevada Law**

    A.    **Under the Federal Arbitration Act, Arbitration Clauses That Violate State Unconscionability Laws Are Invalid And Unenforceable**

Section 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, provides that arbitration clauses are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Thus "state law, whether of legislative or judicial origin," may be applied to invalidate arbitration clauses "*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987). In particular, the U.S. Supreme Court has stated that state contract law of unconscionability "may be applied to invalidate arbitration agreements without contravening" the FAA. *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). The Nevada Supreme Court, in agreement with the vast majority of courts to consider the issue, has held that the FAA does not preempt state laws that strike unconscionable terms embedded in arbitration clauses. *Burch v. Dist. Ct.*, 118 Nev. 438, 442 (2002). HSBC's arbitration clause may not be enforced if it is unconscionable under general principles of Nevada contract law.

Under Nevada law, "[g]enerally, both procedural and substantive unconscionability must be present in order for a court to exercise its discretion to refuse to enforce a . . . clause as unconscionable." *D.R. Horton,* 120 Nev. at 553, *citing Burch*, 118 Nev. at 442. Procedural unconscionability concerns unequal bargaining power. *Id*. at 554, *citing Armendariz v. Foundation Health Psychcare*, 6 P.3d 669, 690 (Cal. 2000). Substantive unconscionability "focuses on the one-sidedness of the contract terms." *Id*., *quoting Ting v. AT & T*, 319 F.3d 1126, 1149 (9th Cir. 2003), *cert. denied*, 540 U.S. 811.

While both procedural and substantive unconscionability are required for a court to refuse to enforce a clause as unconscionable, the Nevada Supreme Court held that in order to establish

unconscionability, less evidence of substantive unconscionability is required where procedural unconscionability is great. *See Burch*, 118 Nev. at 444, *citing Armendariz*, 6 P.3d at 690.

Although the Nevada court has never addressed whether the reverse is true – that less procedural unconscionability is required in cases involving great substantive unconscionability – it stands to reason that should be the law. The California Supreme Court held precisely that in *Armendariz*: "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is, unenforceable, and vice versa. *Armendariz,* at 114.

### B. This Court Should Decide Whether the Arbitration Provision, Class Ban, And Delegation Clause Are Enforceable

According to HSBC, only the arbitrator, not this Court, can determine the enforceability of the arbitration agreement, the delegation provision (purportedly delegating the issue of enforceability to the arbitrator), and the class action ban. Defendant Motion at 11 ("Def. Mo."). HSBC neglects to mention however, that the sole arbitrator acceptable under its agreement, JAMS, *is prevented by its own rules* from determining the validity of a class action waiver. The JAMS Class Action Procedures provide that "JAMS will not administer a demand for class action arbitration when the underlying agreement contains a class preclusion clause, or its equivalent, unless a court orders the matter or claim to arbitration as a class action." Rule 1(a), 2009 (available at: http://www.jamsadr.com/rules-class-action-procedures/).[1] Thus, according to HSBC, the court cannot consider issues relating to the enforceability of the class action ban because of the arbitration agreement HSBC has drafted and imposed, and the arbitrator it has selected is precluded from doing so because of its own internal procedures.  HSBC's effort to

---

[1] HSBC's agreement lists JAMS and NAF as acceptable arbitrators, but NAF was forced out of the business of consumer arbitrations because of its lack of neutrality.

avoid *any* review of its class action ban is unconscionable, and the delegation clause should not be enforced with respect to the class action ban.[2]

This case is distinguishable from *Rent-A-Center v. Jackson*, No. 09-497, ___ U.S. ___, slip op., (June 21, 2010), in which the parties "clearly and conspicuously" agreed to have the arbitrator decide the "interpretation, scope and enforceability of the arbitration agreement." *Id.*, at 4, (agreement provided that "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable"). In *Rent-A-Center,* the arbitration agreement, and the delegation clause, unlike HSBC's, were conspicuous and clear.[3] Moreover, in *Rent-A-Center* there was no issue regarding the arbitrator's inability to resolve the enforceability of the class action waiver, as is the case here.

*Stolt-Nielsen SA v. Animal Feeds Int'l Corp.*, 559 U.S. __ (Apr. 27, 2010), is likewise inapplicable to the facts of this case, and HSBC's efforts to avoid a class action or arbitration. *Stolt-Nielsen* involved a dispute between shippers and carriers in the maritime industry, and the arbitration agreement was contained in a "charter party" or a vessel lease for carriage of goods at sea. *Id.*, at 1. According to evidence presented to the arbitration panel, class actions in this industry were unknown and were not, therefore, a part of the custom and practice of the maritime

---

[2] HSBC contends that Ms. Hood does not separately challenge the delegation clause. Yet her complaint challenges the entire arbitration clause, of which the delegation clause is a part, and she challenges the enforceability of both here. Alternatively, if the court deems it necessary to specifically challenge the delegation clause in the complaint, Ms. Hood would seek leave to amend her complaint.

[3] HSBC's purported delegation clause is part of this lengthy sentence: "Any claim, dispute, or controversy (whether based upon contract; be it intentional or otherwise; constitution; statute; common law; or equity and whether preexisting, present or future), including initial claims, counter-claims, cross-claims and third party claims, arising from or relating to this Agreement or the relationships which result from this Agreement, including the validity or enforceability of this arbitration clause, any part thereof or the entire Agreement ("Claim"), shall be resolved, upon the election of you or us, by binding arbitration pursuant to this arbitration provision and the applicable rules or procedures of the arbitration administrator selected at the time the Claim is filed."

industry. There was no challenge to the arbitration agreement on unconscionability grounds, or on the grounds that the absence of a class action would have an exculpatory effect.

Here, obviously the parties are not sophisticated multi-national companies accustomed in their repetitive business practices to using a standard contract and arbitration clause. And there is certainly a substantial history and practice of class arbitration in the consumer class action context, unlike the maritime industry where class actions were unknown and unanticipated.

### C.   HSBC's Arbitration Clause With Its Class Action Ban Is Procedurally Unconscionable

HSBC's arbitration clause and class action ban are procedurally unconscionable because they are contained in an adhesion contract, their effects are not readily ascertainable, and the clauses are inconspicuous. *D.R. Horton*, 120 Nev. at 554-557.

### 1.   HSBC's Contract Is An Adhesion Contract

"A clause is procedurally unconscionable when a party lacks a meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract." *D.R. Horton*, 120 Nev. at 554, *citing Armendariz*, 6 P.3d at 690.[4]

Contractual clauses contained within contracts of adhesion are procedurally unconscionable. *Id.* HSBC's purported arbitration agreement, which contains the class action ban, was presented to Ms. Hood on a take-it-or-leave-it basis. These two terms were mere subparts of HSBC's 11 page "Cardholder Benefits" brochure. The arbitration clause was drafted by HSBC, the party with far greater economic power, and presented to Ms. Hood in a preprinted form. She was not given an opportunity to decline, to opt out or to negotiate the terms of the arbitration clause. This is an adhesion contract.

As the Nevada Supreme Court noted in *Burch*, "[t]he distinctive feature of an adhesion contract is that the weaker party has no choice as to its terms." *Burch*, 118 Nev. at 442. An

adhesion contract is "a standardized form offered to consumers . . . on a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain." *Id.* As in *Burch*, here the weaker party "was not given an opportunity to negotiate [] terms . . .; they were required to 'take it or leave it.'" *Id.* Accordingly, under Nevada law, HSBC's class action ban and arbitration clause are procedurally unconscionable.

Courts in other jurisdictions are consistent. *See, e.g., Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 984 (9th Cir. 2007) ("compared to the individual class members, Cingular had substantially greater bargaining power as a large, sophisticated corporation"); *Discover Bank v. Super. Ct.*, 113 P.3d 1100, 1110 (Cal. 2005) (class action waivers embedded in contracts of adhesion are unconscionable when "the party with the superior bargaining power has carried out a scheme"); *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 265 (Ill. 2006) ("[c]ourts are more likely to find unconscionability when a consumer is involved, when there is a disparity in bargaining power") (citation omitted).

The case cited by HSBC, *Mallin v. Farmers Insurance Exchange,* 839 P. 2d 105, 118 (Nev. 1992), and its holding that adhesion contracts "are not procedurally unenforceable *per se*" Def. Mo. at 11, is not to the contrary. Under Nevada law, contracts must contain elements of both procedural and substantive unconscionability to be unenforceable. Adhesion contracts may be procedurally unconscionable, but not necessarily unenforceable, unless there is some degree of substantive unconscionability as well. *D.R. Horton*, 120 Nev. at 553.

## 2. The Effects Of HSBC's Clause Are Not Readily Ascertainable

The finding that the arbitration clause is a contract of adhesion is alone sufficient to declare the clause procedurally unconscionable. An additional basis exists however. The clause is also procedurally unconscionable on the independently sufficient grounds that the exculpatory

---

[4] The Nevada Supreme Court relied extensively on *Armendariz* in its decisions in *D.R. Horton*, 120 Nev. at 1162, 1165 n.2, and *Burch*, 118 Nev. at 444 n.17.

effect of the class ban is not readily ascertainable. In *D.R. Horton*, this Court found procedural

unconscionability where, "even if any of the home purchasers noticed and read the arbitration

provision . . . they would not be put on notice that they were agreeing to forgo important rights

under state law," namely, the right to a jury trial and the right to recovery of attorney's fees that

would be compromised by submitting the claim to arbitration. *D.R. Horton*, 120 Nev. at 557.

While the Court noted that the right to request attorney's fees would still exist in an arbitration

proceeding, the arbitration provision at issue provided that each party was to bear its own

attorney fees and expenses. *Id*. The Court concluded by holding that "an arbitration clause must

at least . . . clearly put a purchaser on notice that he or she is waiving important rights under

Nevada law." *Id*.

 Here, HSBC's arbitration clause does not put Ms. Hood on notice as to the rights she

would be giving up. For several reasons, the manner in which the arbitration clause was

presented to Ms. Hood leads to a low likelihood that Ms. Hood will understand its ramifications.

 For example, HSBC fails to disclose that the class action ban would effectively prevent

Ms. Hood from holding HSBC accountable for small claims. It is extremely unlikely that most

consumers whose cars are repossessed by HSBC will realize that they have a claim, and

consumers would never guess that the class action ban would allow HSBC to abrogate their

statutory rights with virtual impunity.

### 3. HSBC's Arbitration Provision Is Not Conspicuous

 HSBC's arbitration clause and class action waiver is contained not in the agreement

signed by borrowers, but in a separate brochure titled "Cardholder Benefits" which is

incorporated by reference. The arbitration clause and waiver are contained on page 7 of the 11

page brochure. Nothing about the way the clause is printed, with the exception of the last

sentence, distinguishes it from other provisions or makes it more conspicuous. *See D.R. Horton*,

120 Nev. at 556 (arbitration clause was procedurally unenforceable because, *inter alia*, it was on

the back of agreement and signature line was on the front; font of clause was small and was not capitalized, making it inconspicuous; and nothing about the clause called attention to the importance of it); *see also KJH & RDA Investor Group, LLC v. The Eighth Judicial District Court*, 2009 WL 1455992 (Nev. 2009) (arbitration agreement *was* conspicuous where every page of agreement was initialed by buyer).

    **D.**    **HSBC's Arbitration Clause Is Substantively Unconscionable Because It Contains A Class Action Ban**

        **1.**    **HSBC's Class Action Ban Is Substantively Unconscionable Because It Is Exculpatory In This Case**

      HSBC's class action ban is substantively unconscionable because it effectively serves as an exculpatory clause, relieving HSBC of liability for its wrongdoing in situations where the potential recovery to individual plaintiffs is small. ven though it is undisputable as a matter of law that HSBC abrogated consumers' statutory rights upon repossession, those consumers will be deprived of any remedy at all if HSBC's class action ban is enforced. As Judge Posner has aptly noted, "[t]he *realistic* alternative to a class action is not 17 million individual suits but zero individual suits." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

      A growing number of courts have rejected precisely this outcome based on principles of substantive unconscionability that are functionally equivalent to Nevada law. The leading case is *Ting v. AT & T*, 182 F. Supp. 2d 902 (N.D. Cal. 2002), *aff'd as to unconscionability*, 319 F.3d 1126 (9th Cir. 2003), which is cited with approval by the Nevada court in *Horton,* at 554. In *Ting,* the district court conducted a 22 day evidentiary hearing to determine, *inter alia,* whether AT&T's arbitration clause, which banned class actions, was unconscionable. *Id.* at 930. In reasoning affirmed by the 9th Circuit (*see Ting,* 319 F.3d at 1150), the district court held that the prohibition on class actions was substantively unconscionable because it was one-sided and non-mutual, and also because it acted as a *de facto* exculpatory clause. *Ting,* 182 F. Supp. 2d at 930-31. The facts revealed that "[t]he potential reward would be insufficient to motivate private

counsel to assume the risks of prosecuting the case for just an individual on a contingency basis." *Id*. at 918; *see also Gentry v. Super. Ct.*, 42 Cal. 4th 443, 457, 165 P.3d 556 (Cal. 2007).

Numerous reported state and federal decisions interpreting state law have similarly declared class action bans unconscionable where they exculpate corporations from liability for small claims. *See Jones v. DirecTV, Inc.,* 2010 WL 2232265 (11th Cir. June 3, 2010) (class action ban in subscriber agreement arbitration clause was unconscionable because arbitration costs would deter subscribers from pursuing small damages claims), *citing Dale v. Comcast Corp.,* 498 F.3d 1216, 1224 (11th Cir. 2007) (factors in determining enforceability of a class action waiver include "fairness of the provisions," cost of arbitration in comparison to potential recovery, likelihood of recovering attorney's fees, the power the waiver gives the company "to engage in unchecked market behavior"); *Skirchak v. Dynamics Research Corp., Inc.*, 432 F. Supp. 2d 175, 181 (D. Mass. 2006), *aff'd*, 508 F.3d 49 (1st Cir. 2007) (class action ban substantively unconscionable because it "circumscribes the legal options of these employees, who may be unable to incur the expense of individually pursuing their claims"); *Leonard v. Terminix Int'l Co.*, 854 So.2d 529, 539 (Ala. 2002) (class action waiver essentially closed the door of justice to consumers); *Szetela v. Discover Bank*, 118 Cal. App. 4th 1094, 1001 (Cal. Ct. App. 2002) (class action waiver essentially gave Discover "a license to push the boundaries of good business practices to their fullest limits, fully aware that relatively few, if any, customers will seek legal remedies"); *S.D.S. Autos, Inc. v. Chrzanowski*, 976 So.2d 600, 606 (Fl. Dist. Ct. App. 2007) (class action ban "effectively prevents consumers with small, individual claims based upon motor vehicle dealers' violations of [Florida's Unfair or Deceptive Acts or Practices Statute], from vindicating their statutory rights"); *Whitney v. All-Tel Communications*, 173 S.W.3d 300, 314 (Mo. Ct. App. 2005) (*accord*); *Muhammad v. County Bank of Rehobeth Beach*, 912 A.2d 88, 91, 99 (N.J. 2006) (*accord*); *Fiser v. Dell Computer Corp.*, 188 P.3d 1215, 1220 (N.M. 2008) (*accord*); *Schwartz v. Alltel Corp.*, 2006 WL 2243649, at *4 (Ohio Ct. App. June

29, 2006); *Vasquez-Lopez v. Beneficial Oregon, Inc.*, 152 P.3d 940, 950 (Or. Ct. App. 2007);

*Thibodeau v. Comcast Corp.*, 912 A.2d 874, 885 (Pa. Super. Ct. 2006); *Scott v. Cingular*

*Wireless L.L.C.*, 161 P.3d 1000, 1003 (Wash. 2007).

These decisions represent a clear trend in the law: "There is an increasing sense on the part

of courts that [corporate] accountability in the marketplace is being eliminated by class action

prohibitions." Nathan Koppel, *Recent Rulings Bolster the Case for Class Actions*, Wall St. J.,

July 3, 2008, at B7, *supra* note 1. Where class action bans are exculpatory due to the small

claims at issue in a case, the bans are substantively unconscionable. This is certainly the case

here. Few, if any, class members would ever know that they had claims against HSBC, much less

be able to sue it on an individual basis.

Several courts have found class action bans to be exculpatory for additional reasons that

apply to the facts of this case. The California Supreme Court found a class action ban to be

impermissibly exculpatory where the ban impedes the pursuit of statutory legal remedies for

those harmed by fraudulent activity. *Gentry*, 42 Cal. 4th at 457.

And at least four state supreme courts have struck down class action bans in part on the

ground that the vast majority of consumers, absent the class action device, would not realize that

they have a claim. *See Kinkel,* 857 N.E.2d at 268 ("The typical consumer may feel that such a

charge is unfair, but only with the aid of an attorney will the consumer be aware that he or she

may have a claim that is supported by law."); *Muhammad*, 912 A.2d at 100 (without a class

action, "many consumer fraud victims may never realize that they may have been wronged");

*Scott*, 161 P.3d at 1007 (same); *cf. Gentry*, 42 Cal. 4th at 462 ("some individual employees may

not sue because they are unaware that their legal rights have been violated"). The facts in this

case are that most consumers who have received defective notices from HSBC are unlikely to

realize that they have a claim.

It is extremely unlikely that, absent a class action, most consumers would be familiar with

the Nevada UCC provisions regarding repossession rights, nor would they be likely to know that HSBC gave them notices that misstated or abrogated their statutory rights. This is exactly the type of scenario presented in the *Scott*, *Kinkel*, and *Muhammad* cases.

Finally, as discussed in *Gentry*, a class action is the only practical manner to enforce Nevada's statutory policy against letting a corporation benefit from fraud and deceptive trade practices. Even proponents of class action bans have admitted that their primary use is to exculpate their drafters from liability. As one lawyer encouraging the use of class action bans wrote: [T]he franchisor with an arbitration clause should be able to require each franchisee in the potential class to pursue individual claims in a separate arbitration. Since many (and perhaps most) of the putative class members may never do that . . . strict enforcement of an arbitration clause should enable the franchisor to dramatically reduce its aggregate exposure. Edward Wood Dunham, *The Arbitration Clause as a Class Action Shield*, 16 FRANCHISE L.J. 141, (1997).

This Court must reject the effort by HSBC to reduce aggregate exposure by avoiding liability through class action bans. Though the issue of exculpatory class action bans has not been addressed by Nevada courts, Nevada law is consistent with the law recognized in most other state supreme courts for two reasons.

First, the Nevada Supreme Court has held that while explicit exculpatory contract clauses may be upheld in limited situations, they "are not a favorite of the law" and "must spell out the intention of the [exculpated] party with the greatest intention." *Agricultural Aviation Eng'g v. Bd. of Clark Cty. Comm'rs*, 106 Nev. 396, 399-400 (1990). Thus, in a situation such as the present case, where HSBC's class action ban works as an *implicit* exculpatory clause, *Agricultural Aviation* suggests that the Nevada Supreme Court will be predisposed to look upon the clause with disapproval.

Second, the Nevada Supreme Court has relied extensively on California courts, and federal courts interpreting California law, to develop its unconscionability jurisprudence. *See*

12

*D.R. Horton*, 120 Nev. at 553-54, 557-58, *quoting Armendariz* and *Ting* to define

unconscionability under Nevada law; *Burch*, 118 Nev. at 444, *quoting Armendariz* and *24 Hour*

*Fitness, Inc. v. Super. Ct.*, 66 Cal. App. 4th 1199 (Cal. Ct. App. 1998) regarding the relative

levels of procedural and substantive unconscionability required to establish that a term is

unconscionable. As detailed above, courts applying California law have found exculpatory class

action bans to be unconscionable and unenforceable. *Ting*, 182 F. Supp. 2d at 930-31; *Discover*

*Bank*, 113 P.3d at 1108-09; *Szetela*, 97 Cal. App. 4th at 1001.

 It is, therefore, a natural extension of the Nevada court's prior unconscionability rulings to

continue to look to courts interpreting California law for the proposition that an exculpatory class

action ban is substantively unconscionable. *See Mandel v. Household Bank (Nevada) N.A.,* 129

Cal. Rptr. 2d 380 (Cal. Ct. App., 4th Dist. 2003), *rev. granted and opinion superseded pending*

*appeal,* 132 Cal. Rptr. 2d 525, 65 P.3d 1284 (Cal. 2003), *rev. dismissed,* 29 Cal. Rptr. 3d 1, 112

P.3d 1 (Cal. 2005):

> Nevada mirrors California in its analysis of unconscionability (*Burch v. Second*
> *Judicial District Court* (Nev. 2002) — Nev. —, 49 P.3d 647, 650-651, fns. 14,
> 17, 18), and we assume the result in *Szetela* would be the same had Nevada law
> applied. A party may not be forced to abide by contract terms that were obtained
> as a result of unfair bargaining power and are so one-sided and oppressive as to
> "shock the conscience.... Therefore, the proper course is to sever the ban on class
> actions and enforce the remainder of the arbitration agreement. (Nev.Rev.Stat.
> Ann., § 104.2302, subd. 1; *Vincent v. Santa Cruz* (1982), 98 Nev. 338, 647 P.2d
> 379, 381; *see also Armendariz v. Foundation Health Psychcare Services, Inc.*
> (2000), 24 Cal. 4th 83, 99 Cal. Rptr. 2d 745, 6 P.3d 669.").

 Given the state of Nevada unconscionability law, and the ultimate effect of class action

bans, this Court should find that HSBC arbitration provision is substantively unconscionable.

### 2. HSBC's Class Action Ban Is Substantively Unconscionable Because It Is One-Sided

 Even if this Court does not agree that HSBC's class action ban is substantively

unconscionable because it exculpates HSBC from liability from small claims, this Court should

still hold that the class action ban is substantively unconscionable because it is one-sided. The

Nevada Supreme Court has adopted the Ninth Circuit's holding that, "[w]here an arbitration agreement is concerned, the agreement is unconscionable unless the arbitration remedy contains a 'modicum of bilaterality.'" *D.R. Horton*, 120 Nev. at 558, *citing Ting*, 319 F.3d at 1149. In *D.R. Horton*, the court invalidated a liquidated damages provision that would penalize one party to the contract if it chose to forego arbitration, but imposed no similar penalty on the party that drafted the provision. *Id*.

The Court held that, even though "the one-sidedness of the provision is not overwhelming," it was sufficiently one-sided as to be substantively unconscionable. *Id*. In *Burch*, the Nevada Supreme Court found evidence of substantive unconscionability where an arbitration clause granted one party's insurer "the unilateral and exclusive right to decide the rules that govern the arbitration and select the arbitrators." *Burch*, 118 Nev. at 444. "These provisions," the Court explained, "are 'oppressive terms,' and as such, are substantively unconscionable and unenforceable." *Id*., *citing 24 Hour Fitness,* 66 Cal. App. 4th at 1213 (1998).

The class action ban at issue in this case is just as one-sided as the provisions the Nevada Supreme Court struck down in *Burch*, and more one-sided than the liquidated damages provision in *D.R. Horton*. This case itself proves that HSBC's customers will, on occasion, bring class actions against the company. But it is unimaginable under any scenario that HSBC would ever sue its customers on a class action basis, making illusory the purported "mutual" nature of the provision. The class action ban in HSBC's contract is therefore one-sided in that it strips its customers of a remedy that they may conceivably invoke over time – and that has, in fact, been invoked here – but leaves HSBC's rights perfectly intact. This fact alone renders HSBC's arbitration clause substantively unconscionable.

Numerous state courts and federal courts applying state law have held that where a company's contract prohibits class actions, the provision is one-sided – and therefore substantively unconscionable – because it takes away a remedy that only consumers would ever

14

use. *Ting*, 319 F.3d at 1150; *Lowden v. T-Mobile, USA, Inc.*, 2006 WL 1009279, at *5-6 (W.D. Wash. Apr. 13, 2006), *aff'd*, 512 F.3d 1213 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 45 (2008); *Discover Bank*, 113 P.3d at 1109; *Powertel v. Bexley*, 743 So.2d 570 (Fla. Dist. Ct. App. 1999); *Vasquez-Lopez*, 152 P.3d at 949-50; *Scott*, 161 P.3d at 1008.

The decisions discussed above are consistent with, and a logical extension of, the Nevada Supreme Court's decisions in *D.R. Horton* and *Burch*. This Court should, in particular, embrace and endorse the reasoning of *Ting*, *Szetela*, and *Discover Bank* to hold that nominally mutual class action bans that will only ever be invoked by one party are one-sided and therefore substantively unconscionable.

III.   **HSBC'S PREEMPTION CLAIM IS CONTRADICTED BY THE OCC'S OWN POSITION ON THE APPLICATION OF THE UCC**

Ms. Hood's complaint alleges that HSBC's post repossession notices violate Nev. Rev. Stat. §§ 104.9613 and 9614, Nevada's enactment of the Uniform Commercial Code. Astonishingly, HSBC claims that these UCC provisions do not apply to its repossession practices, because they are preempted by the National Bank Act and OCC regulations. Yet, neither the National Bank Act nor the OCC regulations contain any repossession provisions. And, as HSBC's contract contains no provisions regulating its repossession of borrowers' property, or requiring notice to borrowers, if HSBC is correct *nothing* requires it to give any notice, or to conduct its repossessions in a commercially reasonable manner. HSBC does not cite a single decision by any court that has preempted the UCC in favor of the OCC regulations, because there are none. Even the OCC does not agree that the UCC is preempted by its regulations. HSBC's motion to dismiss on this basis should be denied.

A.   **Federal Preemption Does Not Apply**

Congress has enacted no law immunizing national banks from compliance with the UCC when they repossess and dispose of financed motor vehicles. Nor has it authorized the OCC to

15

preempt such state laws. In fact, the OCC's regulation at issue does not preempt the statutory

provisions at issue, as the OCC itself has acknowledged with respect to the UCC claim.

**B.      The OCC Regulation Does Not By Its Terms Preempt the UCC**

The OCC regulation on which HSBC relies, 12 C.F.R. § 7.4008(d), states that:

> A national bank may make non-real estate loans without regard to
> state law limitations concerning:
> * * *
> (iv) The **terms of credit**, including the schedule for repayment of
> principal and interest, amortization of loans, balance, payments
> due, minimum payments, or term to maturity of the loan, including
> the **circumstances under which a loan may be called due** and
> payable upon the passage of time or a specified event external to
> the loan;
> * * *
> (vi) **Security property**, including leaseholds; [and]
> * * *
> (viii) **Disclosure** and advertising, including **laws requiring
> specific statements, information, or other content** to be included
> in credit application forms, credit solicitations, billing statements,
> credit contracts, or **other credit-related documents**.

(emphasis by HSBC)

Contrary to HSBC's contentions, the UCC repossession notice provisions are not

encompassed by this regulation.  HSBC argues that repossession notice protections purport to

impose requirements regarding "terms of credit," which are preempted by § 7.4008(d)(2)(iv).

Def. Mo. at 20. The examples contained in the regulation, however, which illustrate the meaning

of the term "terms of credit" are entirely dissimilar to repossession protections. According to the

regulation, "terms of credit" include "the schedule for repayment of principal and interest,

amortization of loans, balance, payments due, minimum payments, or term to maturity of the

loan, including the circumstances under which a loan may be called due and payable upon the

passage of time or a specified event external to the loan" 12 C.F.R. § 7.4008(d)(2)(iv).

These examples make clear that repossession protections are not "terms of credit" as that

phrase is normally used.  None of the terms of Ms. Hood's loan are in dispute here. Those terms

were set when she purchased the car. Instead, the UCC repossession provisions at issue come into play well after credit has been granted. *See Hussey-Head v. World Savings and Loan Ass'n,* 111 Cal. App. 4th 773, 782 (2003) (similar OTS regulation preempting "terms of credit" does not preempt state laws that "do[] not come into play until *after* a loan is made or credit otherwise extended, and [which do] not affect the manner in which the lender services or maintains the loan.") (emphasis added).

The next provision that HSBC contends preempts the UCC is 12 C.F.R. § 7.4008(d)(viii), which preempts laws governing the disclosure and advertising of loans.  Again, none of the examples in the regulation pertain to repossession notices, but instead address documents related to the advertisement of credit and the disclosure of credit terms. Nor is the post repossession notice a "credit related document," as HSBC suggests. Credit-related documents are documents that are created or used when credit is being extended, offered or solicited, or during an ongoing credit relationship. *See, e.g., Kunert v. Bank of America Nat. Trust and Savings Ass'n,* 2001 WL 1715929 (Cal. Super. Ct. Trial Div., Aug. 3, 2001) (same language in OTS regulation) preempts state laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants).

Finally, HSBC cites 12 C.F.R. § 7.4008(d)(2)(vi) which preempts state law imposing requirements on "security property." Def. Mo. at 21. The regulation provides no further explanation of the types of laws included in this category, or any illustrative examples, nor does it appear that any courts have interpreted this provision. Nothing in the regulation suggests, however, an intention that this provision apply to repossession notice requirements. The UCC notice provisions do not limit or impose requirements on the security a lender may take, but merely require a simple notice when that property is repossessed and sold.

17

None of the examples of preempted laws extend to repossession statutes. Moreover, the

exclusions contained in the regulation confirm that UCC repossession requirements are <u>not</u>

preempted:

> (e) *State laws that are not preempted.* State laws on the following subjects are not inconsistent with the non-real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' non-real estate lending powers:
>
> (1) Contracts;
> ……
> (4) Rights to collect debts;
> …….
> (8) Any other law the effect of which the OCC determines to be incidental to the non-real estate lending operations of national banks or otherwise consistent with the powers set out in paragraph (a) of this section.

This provision excludes from the scope of any preemption those state laws governing

"the rights to collect debts." The UCC provisions at issue here fall within this exclusion, as they

govern the manner in which collateral may be repossessed and impact the right to and amount of

any deficiency owed by the secured party.

Indeed, the OCC itself in an interpretive letter has determined that the UCC is not

preempted by the regulation because it is a uniform law of general applicability on which parties

rely in their daily commercial transactions:

> You have described the UCC as providing 'the basic legal infrastructure for sales and leases of goods, negotiable instruments and bank deposits and check collection, commercial funds transfers, letters of credit, documents of title, investment securities and personal property secured transactions, including loans.' You have asked us to confirm your conclusion that:
>
>> the UCC is a body of state law that does not obstruct, impair, or condition the ability of national banks to exercise fully the powers granted by federal law. Rather those powers are implemented and supported by the UCC, which provides a uniform law of general applicability on which parties rely in their daily commercial transactions.
>
> We agree. Accordingly, such provisions would not be preempted under the OCC's preemption rules nor under the judicially-developed standards of preemption that would be applicable to the preemption analysis of laws not specifically listed in our regulations.

18

OCC, Interpretive Letter #1005 (June 10, 2004). (Attached as Exhibit A).

In light of the OCC's interpretation of its own regulation, it is hard to understand the basis for HSBC's motion, at least with regard to the UCC claims. It is also hard for HSBC to claim that providing the notice required by the UCC would impair its ability to exercise the powers granted by the NBA: HSBC already sends out a repossession notice that purports to comply with at least some of the UCC's requirements. Sending a compliant notice would not "significantly impair" HSBC's lending operations.

No court has held that the provisions of Article 9 are preempted by the National Bank Act. *Crespo v. WFS Fin. Inc*., 580 F. Supp. 2d 614, 623 (N.D. Ohio 2008), relied on by HSBC, involved an issue of preemption under the Homeowners Loan Act (HOLA) and OTS regulations, and the OTS, unlike the OCC, has not issued an opinion letter confirming that UCC provisions are not preempted. *Silvas v. E*Trade Mortg. Corp*., 514 F.3d 1001 (9th Cir. 2008) likewise deals with preemption under HOLA. Both *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032 (9th Cir. 2008) and *Abel v. KeyBank USA, N.A.,* 313 F. Supp. 2d 720 (N.D. Ohio 2004) deal with non-uniform state laws imposing non-standard requirements, namely additional disclosures on the face of convenience checks (*Rose*), and liability on any holder for claims against a seller (*Abel*). These laws are distinguishable from the UCC, which as described by the OCC:  "is a body of state law that does not obstruct, impair, or condition the ability of national banks to exercise fully the powers granted by federal law. Rather those powers are implemented and supported by the UCC, which provides a uniform law of general applicability on which parties rely in their daily commercial transactions." OCC Letter*, supra. Kilgore v*. *KeyBank*, *N.A*., 2010 U.S. Dist. LEXIS 35592 (N.D. Cal. Apr. 12, 2010) similarly involves the issue of raising seller related claims against a national bank.

## IV.    MS. HOOD HAS NOT ASSERTED ANY CLAIMS PREEMPTED BY THE FCRA

Ms. Hood has asserted that class members' alleged deficiencies are not owed and that

therefore any efforts to collect the deficiencies and any reports made to credit bureaus regarding the alleged deficiencies are unlawful.  Ms. Hood is seeking equitable and declaratory relief to stop HSBC's collection and reporting of these debts which are not owed. Section 1681s-2 governs the accurate reporting of credit information by furnishers, and the FCRA preempts state law claims based on conduct governed by 1681s-2.  Ms. Hood's claim challenges the validity of the debt itself, based on the UCC, not HSBC's method of reporting information. Clearly, if the debt is not valid, HSBC cannot report it as valid to a credit bureau.

## V.    Ms. Hood's NDTPA Claim Is Not Preempted

Nevada's Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*., does not contain a broad exemption for banks or other lending institutions. Instead, it provides that the Act does not apply to "*conduct in compliance* with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency. Nev. Rev. Stat. § 598.0955(a). Here, HSBC cannot claim that its conduct in sending post repossession notices is in compliance with any order, rule or statute. No federal statute governs the sending of or content of repossession notices.

In addition, Ms, Hood's complaint sufficiently pleads her claim under the NDTPA. Her claim is not a fraud claim as HSBC suggests. Instead, she claims that HSBC's failure to include certain required disclosures, each one identified in the complaint, is a deceptive trade practice. Ms, Hood has alleged that HSBC's form notices sent to class members after their vehicles were repossessed contained misstatements and omissions. She has adequately pled a violation of the NDTPA. To the extent the court decides that further pleading is required, Ms. Hood would seek leave to amend her complaint.

## VI.   Conclusion

For all of the foregoing reasons, HSBC's Motion to Compel Arbitration or to Dismiss, should be denied in its entirety.

Respectfully submitted
on behalf of Plaintiff,

*/s/ John Roddy*
JOHN RODDY, ESQUIRE, *Pro Hac Vice*
RODDY KLEIN & RYAN
727 Atlantic Avenue, 2nd Floor
Boston, MA 02111
(617) 357-5500 Telephone
(617) 357-5030 Telecopier

ROBERT W. MURPHY
Florida Bar No. 717223
1212 S.E. 2nd Avenue
Ft. Lauderdale, FL 33316
(954) 763-8660 Telephone
(954) 763-8607 Facsimile
E-mail: rphyu@aol.com

STEVEN M. FAHLGREN, ESQUIRE
Florida Bar No. 08450
Law Offices of Steven M. Fahlgren, P.A.
552382 US Highway 1 North
Hilliard, Florida 32046
(904) 845-2255 Telephone
(904) 845-3934 Telecopier

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on August 9, 2010.

*/s/ John Roddy*
John Roddy